AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

LODGED
CLERK, U.S. DISTRICT COURT

11/20/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

11/20/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____KL_____ DEPUTY

United States of America,

v.

ZHENYI QI,

Defendant.

Case No.    2:20-mj-05690-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between July 9, 2019 and July 24, 2020, in the county of Los Angeles in the Central District of California, the

defendant violated: 18 U.S.C. § 1344, Bank Fraud; 18 U.S.C. 1544, Misuse of a Passport; and 18 U.S.C.

§1028A, Aggravated Identity Theft.

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1544 | Misuse of a Passport |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

**LUIS OROZCO**
_____
*Complainant's signature*

Luis Orozco, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        November 20, 2020
_____

*alicia A. Rosenberg*
_____
*Judge's signature*

City and state:   Los Angeles, California
_____

Hon. Alicia G. Rosenberg
_____
*Printed name and title*

## AFFIDAVIT

I, Luis Orozco, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against, and arrest warrants for, Zhenyi QI and Thuan LE for violations of 18 U.S.C. §§ 1344, 1544 and/or 1028A, and/or a conspiracy in violation of 18 U.S.C. § 371 to commit one or more of the listed violations.

2. This affidavit is also made in support of the following:

    a. An application for a warrant to search the residence located at 1319 Parkside Drive, West Covina, CA 91792 (the "QI RESIDENCE"), as described more fully in Attachment A-1;

    b. An application for a warrant to search a black 2020 Porsche bearing California license plate number 8SWG709 and vehicle identification number WP0AA2A72LL102301 (the "QI VEHICLE"), as described more fully in Attachment A-2;

3. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of the following statutes, as described more fully in Attachment B: 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1544 (Misuse of a passport), and 18 U.S.C. § 1028A (Aggravated Identity Theft) (the "SUBJECT OFFENSES"). Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF SPECIAL AGENT OROZCO

5.    I am a Special Agent ("SA") with the U.S. Department of State, Diplomatic Security Service ("DSS") and have been so employed since October 2010.  I am currently assigned to the Document and Benefit Fraud Task Force in Los Angeles.  Among my other duties as a SA of the DSS, I investigate criminal violations of the laws governing the issuance of passports and visas, and other related criminal violations involving identity theft.  I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to my current assignment, I served in the San Francisco Field Office, where I conducted criminal investigations of passport and visa fraud. I hold a Master of Science in Leadership and Bachelor of Business Administration.

## III. SUMMARY OF PROBABLE CAUSE

5.    Zhenyi QI and Thuan LE are former employees of a Bank of America ("BofA") branch in this district. BofA is a federally-insured financial institution within the meaning of

2

federal law.  Between July 9, 2019 and July 24, 2020, QI and LE used their positions as personal bankers at BofA to fraudulently open more than 400 BofA bank accounts. Specifically, QI and LE used copies of real and fraudulent Chinese passports to open BofA accounts while the purported-accountholders were not physically present at the time of the account opening, which was a violation of both federal regulations and BofA policy.

6.   In the course of this scheme, QI and LE also used four addresses (two commercial postal stops and two residential addresses) as the addresses of record for all of the 400+ fraudulently-opened accounts. Law enforcement agents have interviewed the residents/operators at three of these addresses, who have stated that QI and LE used these addresses as mail drops, and that the purported accountholders did not reside at those locations.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.   Based on my training and experience, and my observations and investigation into this matter, including my conversations with victims, interviews with witnesses, and my discussions with BofA investigator Rhett Hardy ("Hardy"), I know the following:

*<u>A BofA Internal Investigation Finds Hundreds of Bank Accounts</u>*
*<u>Opened in Violation of Federal Regulations and BofA Policy</u>*

8.   On August 7, 2020, Hardy, a member of the Internal Enterprise Investigations ("IEI") unit at BofA, contacted SA David Morales of Homeland Security Investigations ("HSI") and

myself concerning potential illegal activity that Hardy
suspected had been committed by BofA employees.

9.   Hardy advised that, based on a BofA internal
investigation, he suspected that a former employee named Zhenyi
QI (D.O.B. July 18, 1995), a lawful permanent resident alien
("LPR"), had improperly opened at least 385 BofA bank accounts
between July 9, 2019 and July 24, 2020 (the "QI Accounts").

10.   QI was a BofA employee at a BofA branch located at
8856 Valley Blvd, Rosemead Ca, 91770.   QI had resigned from his
employment with BofA on or about August 24, 2020, following an
internal investigation that resulted in him having been placed
on paid administrative leave for violating internal bank
policies. Specifically, QI was under internal investigation for
opening accounts (the QI Accounts) in the names of individuals
who were not physically present in the relevant BofA branch when
the relevant accounts were opened, as required by BofA's
Customer Identification Program ("CIP") as well as federal
regulations, as stated in 31 CFR 103.121.

11.  31 CFR 103.121, as well as BofA policy, requires that
any nonresident alien ("NRA") individual seeking to open an
account at the bank must (a) be physically present at a bank
when opening an account; (b) present an original, acceptable
identification document (which may include a valid passport);
and (c) demonstrate to the bank that he or she has a valid
physical address in the United States.  BofA's CIP also includes
a specific requirement that employees opening NRA accounts
verify each new account holder's physical address.  Satisfaction

of each of these requirements is material to BofA, intended to ensure compliance with federal banking laws, and a critical component of the bank's anti-money laundering ("AML") protocols. BofA will not open an account for an NRA individual in the absence of compliance with 31 CFR 103.121 and all of the bank's CIP requirements.

12. As described herein, Hardy advised that BofA had determined that the QI Accounts had been opened in the names of dozens of NRA individuals, yet each of the QI Accounts was opened using one of the same four addresses in California. Hardy also advised that BofA believed that all of the QI Accounts had been opened using copies of Chinese passports as identification, in the name of NRAs who were not present in the branch at the time the accounts were opened, in violation of 31 CFR 103.121 and BofA AML policy.

13. As described herein, this information from Hardy was checked and verified by cross-referencing the names of the purported accountholders of the QI Accounts against U.S. Customs and Border protection ("CBP") border crossing records and U.S. Department of State ("DOS") consular visa records.

_The QI Accounts Were Opened Using False Physical Addresses, in Violation of Federal Regulations and BofA AML Policy_

14. Sixty-eight (68) of the QI Accounts identified the purported accountholder's physical address as 145 E. Duarte Road, Arcadia Ca, 91006 (the "Duarte Road address"). That address is assigned to a United States Postal Service ("USPS") authorized commercial mail stop. Under 31 CFR § 103.121,

commercial mail stops are not permitted as physical addresses for foreign nationals as an address of record when opening a U.S. bank account.[1]  The use of the Duarte Road address for the QI Accounts was thus a violation of federal regulations and BofA policy.

15.  On October 19, 2020, SA Orozco and SA Morales went to the Duarte Road address and interviewed the owner, Johanna Zhong. Zhong was provided a list of the 68 accountholder names purportedly receiving mail from BofA at the Duarte Road address. Zhong looked through the business records and only recognized one name as a listed customer. All other names were unknown to Zhong. Zhong admitted that she receives a large amount of mail from various banks for people with Chinese names that are not her customers and do not rent a mail box from her.

16.  Eighty-one (81) of the QI Accounts identified the purported accountholder's physical address as 1608 Nogales Street, Rowland Heights, Ca 91748 (the "Nogales Street address").  The Nogales Street address is also a commercial mail stop.  The use of the Nogales Street address for the QI Accounts was thus a violation of federal regulations and BofA policy.

17.  One hundred seventy-one (171) of the QI Accounts identified the purported accountholder's physical address as 3238 Eckhart Avenue, Rosemead, Ca 91770 (the "Eckhart Avenue address").  That address is the front unit of a multi-unit building, and is approximately 800 square feet in size.  While

---

[1] Commercial mail stops are classified in the same manner as post office boxes ("PO Boxes") and post mail boxes ("PMB's").

this address could have qualified as a legitimate address of record, queries to both commercial and law enforcement databases[2] reflect that none of the purported accountholders of the QI Accounts who used this address ever actually lived there.

18. Sixty-five (65) of the QI Accounts (61 personal NRA accounts and five business accounts) identified the purported accountholder's physical address as 2305 Sherwood Road, San Marino, Ca 91108 (the "Sherwood Road address"). The Sherwood Road address is assigned to a single-family home. While this address could have qualified as a legitimate address of record, queries to both commercial and law enforcement databases reflected that none of the purported accountholders of the QI Accounts who used this address ever actually lived there. Furthermore, and as described below, during an interview with law enforcement, the current resident and a relative of the owner of the Sherwood Drive address denied knowing any of the names or companies associated with these 65 of the QI Accounts.

19. On November 2, 2020, SA Orozco and SA Hermosillo interviewed Zihan Xu and Zizhi Xiong at the Sherwood Road address. Xu and Xiong are both Chinese citizens and currently "F1" students in the United States. Xu and Xiong are residents of Sherwood Road address, and explained the following:

a. Xu and Xiong are in a dating relationship with each other and are friends with QI.

_____

[2] These databases include those maintained by ThomsonReuters and Lexis Nexus, as well as the California Department of Motor Vehicles.

7

b.    QI was the BofA employee who opened Xu's account at BofA in approximately 2018.  QI and Xu stayed in touch with each other via WeChat. Xiong met QI through Xu.

c.    In approximately March or April of 2020, QI contacted Xu and stated he needed to use their address for his customers in China that couldn't come to the United States. Xu and Xiong agreed to let QI use their address and receive mail from BofA.

d.    Xiong explained that QI would text them when he was coming over to pick up the mail, which usually consisted of bank ATM cards, while driving a black 2020 Porsche.

e.    The last time QI picked up the mail from Xu and Xiong was in August of 2020.

f.    Agents showed Xu and Xiong a list of names, all of which had the Sherwood Road address listed as their address, and both Xu and Xiong examined the list and stated that none of the people listed ever lived at the Sherwood Road address, but that some had received mail at the address which had been picked up by QI.

20.  On November 3, 2020, Xiong contacted SA Orozco via phone and told him QI had contacted him asking him if any mail/bank cards had arrived in the mail, as he needed to come by and get them. Xiong further stated that QI told Xu that he was preparing to move back to China permanently and was exchanging US dollars for Chinese currency. Xu looked on WeChat and saw that QI was selling his personal items.

*The QI Accounts Were Opened Without the Purported Accountholders*
*Being Physically Present in the Bank, in Violation of Federal*
*Regulations and BofA AML Policy*

21.  Each of the QI Accounts was opened in the name of a Chinese national using what purported to be a copy of a Chinese passport as the required identification document.  When checked against DOS records, it was determined that, of the 380 passport copies used by QI to open the QI Accounts (385 QI Accounts, minus 5 business accounts that did not list passport numbers), only 61 of the purported accountholders of the QI Accounts had ever been granted valid visas to enter the US.[3] Accordingly, I believe it is highly unlikely that the remaining QI Accounts could have been opened while the passport holder was physically present in the bank, as required by federal regulations and BofA AML policy.

22.  Of the 61 purported accountholders of the QI Accounts who had obtained a valid visa to enter the United States at some point in time, according to CBP records of entry and border crossings, only six of them were found to have potentially been in the United States at the time the relevant QI Accounts in their names were opened by QI. Specifically, two of these

_____

[3] In some instances, multiple QI Accounts were opened in the name of the same purported accountholder. As such, while there were 385 QI Accounts, there are substantially fewer accountholders of the QI Accounts, because some of these individuals' passports were used to open multiple QI Accounts. In addition, one BofA account was opened by QI in the name of Zihan Xu, who received mail for QI at the Sherwood Road address, as described above. This account in Xu's name remains under investigation.

purported accountholders were found to have been in the United
States at the time the relevant QI Accounts were opened, and the
remaining four may have been in the United States, as no visa
departure date has presently been recorded by CBP.  For the six
NRA individuals who were potentially present in the United
States at the time the respective QI Accounts were opened, there
is no evidence in any BofA records that any of these individuals
was actually present in the bank at the time an account was
opened in his or her name.[4]

23.  The chart below lists the 61 purported accountholders
of the QI Accounts who had obtained a valid visa at some point,
and their status when the associated QI Account(s) were opened:

| Date Relevant Account Opened | Passport # | Name | Date of Departure | In US When Account Opened? |
|---|---|---|---|---|
| 7/23/2020 | E92511001 | RUI LI | 1/7/2017 | Not In Country |
| 5/28/2020 | EC9723142 | ZHAODAN LIU | Never in US | Not in Country |
| 6/8/2020 | E03953650 | YUN KUANG | 8/21/2019 | Not In Country |
| 1/16/2020 | G41165489 | YU LI | Never in US | Not in Country |
| 2/4/2020 | E95596147 | ZHENZHEN TANG | 5/11/2018 | Not In Country |
| 7/24/2020 | G47391455 | YUTAO LI | 11/1/2015 | Not In Country |
| 6/22/2020 | EB6617480 | NA GAO | 2/8/2019 | Not In Country |
| 6/1/2020 | E41734919 | ZHE KANG | 10/12/2019 | Not In Country |
| 10/15/2019 | G42751556 | WENJING HU | 11/30/2018 | Not In Country |
| 2/6/2020 | G48921192 | JIANGSHENG WU | 10/6/2015 | Not In Country |
| 5/26/2020 | ED2123563 | CHEN WANG | No Recent Entry | Not in Country |

--------------------

[4] Only one QI Account was opened for each of these six
purported accountholders.

| 12/11/2019 | E0966368 | LING ZHOU | NOT FOUND | Not in Country |
| 5/26/2020 | E32967819 | ZHE TANG | 6/17/2017 | Not In Country |
| 1/13/2020 | E59462304 | BO YANG | 5/17/2018 | Not In Country |
| 6/22/2020 | G44013449 | JIANMIN FENG | 8/11/2019 | Not In Country |
| 8/15/2019 | E68904478 | YONGJIAN XU | Never in US | Not in Country |
| 7/8/2020 | E40934930 | TAO CHEN | 6/30/2015 | Not In Country |
| 3/24/2020 | EE4130925 | BAOHONG CAO | 2/24/2013 | Not In Country |
| 5/18/2020 | EB6882505 | NING LI | 2018 | Not In Country |
| 6/29/2020 | ED6588640 | YING TAO | 11/21/2018 | Not In Country |
| 12/4/2019 | ee6217110 | BIN WU | 10/24/2019 | Not In Country |
| 4/20/2020 | G54969723 | JIAMING ZHU | 7/6/2015 | Not In Country |
| 4/9/2020 | E47488994 | HUAWEI LIU | 1/4/2020 | Not In Country |
| 3/23/2020 | E64851047 | XUAN LUO | 5/20/2018 | Not In Country |
| 7/29/2019 | E85370402 | MINGYANG LI | 1/8/2020 | In Country |
| 5/4/2020 | EC0007737 | YUNZHE JIANG | 6/5/2018 | Not In Country |
| 2/20/2020 | E48569249 | LONG GAO | 6/10/2017 | Not In Country |
| 8/19/2019 | EE5794338 | TIANZHENG XIE | 8/11/2019 | Not In Country |
| 4/6/2020 | E69440222 | WENZHENG WEI | 2/4/2019 | Not In Country |
| 5/8/2020 | E20474178 | QI CHEN | 7/30/2012 | Not In Country |
| 6/15/2020 | G58439374 | PU YAN | 1/11/2013 | Not In Country |
| 7/6/2020 | EB6191736 | DONGDONG WANG | Never in US | Not in Country |
| 4/10/2020 | G55829886 | JUN MA | 6/27/2014 | Not In Country |
| 5/20/2020 | G42329539 | CHUNHUI LI | 1/15/2012 | Not In Country |
| 7/24/2020 | E70034278 | ZHONGYUAN ZHANG | 5/14/2016 | Not In Country |
| 1/24/2020 | E27763099 | JIANYE XU | 12/23/2015 | Not In Country |
| 4/28/2020 | G55564876 | CHENG ZHANG | 10/5/2019 | Not In Country |
| 5/20/2020 | E30427542 | MINGYU CAI | 11/27/2017 | Not In Country |

| 8/15/2019 | E20995071 | LINGHUI KONG | 9/5/2019-9/14/2019 | Not In Country |
|---|---|---|---|---|
| 2/28/2020 | ED1384749 | YAOBIN LU | Never in US | Not in Country |
| 10/9/2019 | E45166815 | ANJIAN HU | 6/10/2017 | Not In Country |
| 1/16/2020 | E10927913 | XUEZONG XU | 2018 Overstay | In Country |
| 11/27/2019 | E35712718 | GANG WU | 11/20/2019 | Not In Country |
| 7/6/2020 | EC7404142 | XIAOFENG SHEN | Never in US | Not In Country |
| 10/11/2019 | K00276590 | ZHE YANG | 8/15/2018 | Not In Country |
| 11/8/2019 | E22410166 | YI XIANG | 8/2/2018 | Not In Country |
| 6/8/2020 | E95102989 | NINGZHEN SU | 10/1/2018 | Not In Country |
| 6/25/2020 | E67872649 | XIAOWEI YANG | 6/27/2017 | Not In Country |
| 6/18/2020 | G39231731 | YUBIN LIN | 1/18/2018 | Not in country |
| 4/27/2020 | E70258967 | LIANG GAO | No Departure | Possibly in country |
| 5/8/2020 | E72404012 | CHAOHAO JIN | 8/28/2017 | Not in country |
| 7/2/2020 | E27967169 | GUOXING MI | 9/1/2019 | Not in country |
| 6/11/2020 | E90245910 | WEIFENG CAI | 1/9/2020 | Not in country |
| 4/30/2020 | EC9470825 | RONGSHUN ZHAO | No Departure | Possibly in country |
| 6/9/2020 | EA3106951 | HUIJUN ZHAO | 4/17/2018 | Not in country |
| 6/1/2020 | E16062274 | XINLEI YOU | No Departure | Possibly in country |
| 6/26/2020 | E39684043 | QINGFENG WU | No entry | Not in country |
| 6/1/2020 | EH5772605 | TING TANG | No Departure | Possibly in country |
| 6/22/2020 | E89280897 | YUNFEI SONG | 1/14/2019 | Not in country |
| 4/28/2020 | E57335631 | WENZHAO MAO | 12/4/2018 | Not in country |
| 4/16/2020 | E15422603 | GUODONG HUANG | 7/9/2016 | Not in country |

24.   In sum, according to BofA records, DOS databases, and CBP border crossing and entry records, of the 380 QI Accounts opened with a passport, 374 were opened with Chinese passports

that were determined to be either (a) invalid or (b) the passport of a person who was not present in the United States at or about the time of the opening of the relevant QI Account.

25.  I have also reviewed notes of an interview of QI conducted by BofA officials on or about July 27, 2020, in which QI admitted that he opened accounts for foreign nationals who were not permanent U.S. residents and that he took custody of the bank cards for these accounts when they were issued.

26.  Based on these facts, there is probable cause to believe that, in opening each of the QI Accounts, QI used copies of valid and invalid passports in the names of the individuals identified above to open the QI Accounts contrary to federal regulations and BofA AML policy, in knowing and unlawful violation of 18 U.S.C. §§ 1344 (bank fraud) and 1544 (misuse of passport).

### *At Least Four of the QI Accounts Were Opened Using False or Altered Passports of Real Persons other than the Identified Accountholder*

27.  Of the 380 Chinese passports used by QI to open the QI Accounts, according to DOS databases and CBP border crossing and entry records, at least four of these passport numbers were found to have been issued to real persons other than those listed on the face of the copy of the passport used to open the

relevant QI Account, in violation of 18 U.S.C. §§ 1028A, 1344, and 1544. Specifically:

    a.   QI opened account #325143485063 in the name of Na GAO on June 22, 2020, using what was purported to be a passport bearing #EB6617480. DOS records revealed no legitimate passport belonging to GAO with that passport number, and CBP records reflect no legal entry by GAO into the US. Passport #EB6617480 was revealed by DOS records to have been issued to Filipino national F.D.R.B. Accordingly, I believe QI opened account #325143485063 using a false or altered version of a passport issued to a real person, namely, F.D.R.B.[5]

    b.   QI opened account #325140257647 in the name of Junlei WANG on March 23, 2020, using what was purported to be a passport bearing #EB4597752. DOS records revealed no legitimate passport belonging to WANG with that passport number, and CBP records reflect no legal entry by WANG into the U.S. Passport #EB4597752 was revealed by DOS records to have been issued to Filipino national J.E.P. Accordingly, I believe QI opened account #325140257647 using a false or altered version of a passport issued to a real person, namely, J.D.P.

---

[5] Based on my training and experience, and my own investigation of this case, I know that it is highly unlikely for passports and associated passport numbers to be issued in the absence of a real person applying for, and receiving, the same passport.

c.   QI opened account #325143940126 in the name of DongDong WANG on July 6, 2020, using what was purported to be a passport bearing #EB6191736. DOS records revealed no legitimate passport belonging to DongDong WANG with that passport number, and CBP records reflect no legal entry by WANG into the U.S. Passport #EB6191736 was revealed by DOS records to have been issued to Filipino national R.M.P.S. Accordingly, I believe QI opened account #325143940126 using a false or altered version of a passport issued to a real person, namely, R.M.P.S.

d.   QI opened account #325143936240 in the name of Xiaofeng SHEN on July 6, 2020, using what purported to be a passport bearing #EC7404142.  DOS records revealed no legitimate passport belonging to SHEN with that passport number, and CBP records reflect no legal entry by SHEN into the U.S.  Passport #EC7404142 was revealed by DOS records to have been issued to Filipino national I.M.O.P. Accordingly, I believe QI opened account #325143936240 using a false or altered version of a passport issued to a real person, namely, I.M.O.P.

*Thuan LE Assists QI and Opens Further Fraudulent Accounts*

28.  Hardy further advised that another former BofA employee, Thuan LE (D.O.B. March 7, 1992), also an LPR, opened an additional 20 bank accounts between April 27, 2020 and June 2, 2020, for different NRA individuals following the same basic process as QI (the "LE Accounts").  Like the QI Accounts, all of

the LE Accounts used Chinese passports as the required identification documents.  Similar to the QI Accounts, eight of the LE Accounts used the Eckhart Avenue address as the account holder's address of record, while the other twelve used the Sherwood Road address.

29.  LE was employed at the same BofA branch as QI.  LE was hired on or about July 30, 2018 and, like QI, resigned from BofA while under internal investigation and after having been placed on paid administrative leave for violating internal bank policies by opening accounts for individuals who were not physically present in the branch.  LE's last day of employment at BofA was August 24, 2020.

30.  Of the 20 individuals in whose names LE opened BofA accounts using Chinese passports, only two had ever been issued valid visas to enter the U.S., and neither of those two individuals were in the U.S. at the time the bank accounts were opened in their names by LE, according to CBP records of entry and border crossings, as identified below:

| Date Account Opened | Passport # | Name | Date of Departure | In US When Account Opened? |
|---|---|---|---|---|
| 5/18/2020 | EA0596695 | LICHENG ZHANG | No record | Not in country |
| 4/27/2020 | EH1965199 | WENDONG LI | No record | Not in country |
| 5/26/2020 | EE0300260 | YONGFENG JIN | No record | Not in country |
| 5/28/2020 | e60067485 | SI TIAN | No record | Not in country |
| 4/27/2020 | E96795020 | CHENJIAO ZHU | No record | Not in country |
| 5/20/2020 | ee1836455 | YUNPING LOU | No record | Not in country |

| 5/28/2020 | eg3923414 | WENXING YAN | No record | Not in country |
|-----------|-----------|-------------|-----------|----------------|
| 5/22/2020 | E65642306 | CHUNRUI ZHANG | No record | Not in country |
| 5/29/2020 | ej3682304 | YANBIN LI | No record | Not in country |
| 5/26/2020 | g56654379 | LUO YANG | No record | Not in country |
| 5/20/2020 | ed5218852 | YAN HUANG | No record | Not in country |
| 5/26/2020 | g40109935 | XIAOHUI CHAI | No record | Not in country |
| 5/29/2020 | G47083704 | XUEQIN LIU | 4/15/2018 | Not in country |
| 6/2/2020 | G49346016 | YAN LI | No record | Not in country |
| 5/27/2020 | EJ527033 | ZAICHENG QI | No record | Not in country |
| 5/28/2020 | e60067485 | SI TIAN | No record | Not in country |
| 5/18/2020 | EB6882505 | NING LI | 4/15/2018 | Not in country |
| 5/27/2020 | EG5285159 | JING MI | No record | Not in country |
| 5/11/2020 | EC6841715 | JIAHUI CAI | No record | Not in country |
| 4/27/2020 | EE3412201 | DEYANG LIN | No record | Not in country |

31.   Accordingly, I believe it is highly unlikely that the LE Accounts could have been opened while the passport holder was physically present in the bank, as required by federal regulations and BofA AML policy.

32.   Based on these facts, there is probable cause to believe that in opening each of the LE Accounts, LE used copies of valid and invalid passports in the names of the individuals identified above to open the QI Accounts contrary to federal regulations and BofA AML policy, in knowing and unlawful violation of 18 U.S.C. §§ 1344 and 1544.

*QI and LE Conspire and Assist Each Other in Violating Federal*
*Regulations and Evading BofA AML Controls*

33.  Due to the employment positions that QI and LE held
with BofA, each had access to the internal systems and AML
controls utilized by BofA when opening bank accounts.  These
protocols, which are required by federal law and BofA AML
policy, generally require approvals by at least two different
individuals.  QI and LE would override BofA system blocks for
each other when opening accounts for NRA individuals who were
not present in the bank, namely, the QI Accounts and LE
Accounts.  By overriding those blocks, QI and LE were able to
open accounts in violation of law and bank policy, disregarding
legal and bank policy requirements that were material to BofA, a
federally-insured financial institution.  In doing so, QI and LE
assisted each other in evading internal security measures put
into place at BofA as part of its AML protocols that were
intended to prevent the opening of bank accounts by people who
were not present in the bank and, had BofA known that QI and LE
were taking the actions described herein, it would have
prevented the opening of these accounts.

*BofA Terminates QI and LE as Bank Employees Following an*
*Internal Investigation*

34.  Hardy advised me that BofA had determined that the
opening of the 385 QI Accounts and 20 LI Accounts violated
BofA's AML policies and CIP, as required by 31 CFR 103.121. In
addition to improperly opening accounts for individuals who were
not present in the branch, neither QI nor LE made and retained

18

copies of original identity documents used to open the accounts. BofA advised that had QI and LE followed all required procedures, the accounts would not have been allowed to be opened.  As a result of their conduct, QI's and LE's employment with BofA was terminated for violation of company policies, to include not following required verification of addresses and identity.  Hardy further advised that LE's and QI's practice of overriding internal blocks on each other's transactions was in further violation of bank policy, and that the accounts for which these blocks were overridden would not have been authorized to be opened had QI and LE not violated the policy.

### The QI RESIDENCE and QI VEHICLE

35.  QI reported his residence to BofA on his employment documents as 1319 Parkside Drive, West Covina, Ca, 91792 (the QI RESIDENCE). Based on my investigation and public source document, I am aware that the QI RESIDENCE is owned by QI's mother and was purchased in approximately 2015.

36.  According to current DMV records, QI's California Driver's license and the QI VEHICLE are each registered at the QI RESIDENCE.

37.  As described above, Zihan Xu described QI driving a black 2020 Porsche consistent with the description of the QI VEHICLE when picking up mail intended for the QI Accounts.

38.  On November 9, 2020, I and other law enforcement agents conducted surveillance of the QI RESIDENCE and observed the QI VEHICLE parked at the QI RESIDENCE in the parking space labeled "1319".

## V.  <u>TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES</u>

39.  Based on my experience and training, and based on my consultation with other law enforcement officers, I know that:

a.  It is common practice for individuals involved in identity theft, bank fraud, and passport fraud to use digital devices.  Such digital devices are often used to facilitate, conduct, and track their fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims. Such digital devices, as well as paper records of items described in this paragraph are commonly found in the houses, garages, and vehicles of those involved in identity theft and access device fraud.

b.  It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license

20

or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers. Such profiles, as well as paper records of the same items described in this paragraph are commonly found in the houses, garages, and vehicles of those involved in identity theft and fraud.

c.   It is also common for identity thieves to use digital devices to store information related to their identity theft crimes long after the crimes have been committed.  This information can include logs of fraudulent transaction history; funds received; individuals and companies that have been victimized; payments from co-conspirators; and victim "profiles."  Such records may also kept in paper in the identity thieves' residences, garages, and vehicles.

d.   It is common for identity thieves, and individuals engaged in bank fraud and identification document fraud to use equipment and software to print identification documents and cards, to create magnetic strips for documents and cards, to use embossing machines to create documents and cards, to use laser printers to create documents and cards, and to use magnetic card readers to read and re-encode documents and cards. These items are commonly found in identity thieves' residences, garages, and vehicles.  Software relevant to such schemes can often be found on digital devices, such as computers.

e.   Individuals involved in fraud and counterfeit identity and various bank fraud schemes commonly keep proceeds of their schemes in their residences, garages, and vehicles.

f.   I also know that it is common practice for members of these criminal groups to use safes and other secured containers as places to hold, maintain, hide, conceal, and store fraudulent cards and documents, and merchandise obtained with the same, as well as other materials relating to their criminal activities.  By hiding the tools and fruits of fraud and identity theft in safes, criminals attempt to conceal the nature of their criminal activities to family, friends, and ultimately law enforcement.  I also know that ultimately these criminal groups hope to obtain genuine currency but due to certain financial regulations, cash is difficult to deposit in traditional financial institutions without raising red flags.  Accordingly, safes and secured containers are often used to hold the cash to prevent theft.

g.   I know that individuals who participate in identity theft, bank fraud, and bank fraud schemes often have co-conspirators who they communicate with by phone, text message, social media and email, including by exchanging photographs of stolen identity information and victims.  In addition, such individuals often maintain contact information for their co-conspirators on their digital devices as well.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

40.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

41.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

42.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

43.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

44.  Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[6]

---

[6] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which

Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

---

data is, generally speaking, deleted once a device is turned off.

45.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,

or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

46. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

47. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into

readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

48.  As discussed herein, based on my training and experience I believe that digital devices will be found during the search.  I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

49.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID.  Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

50.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then

automatically unlocked if the camera detects a face with
characteristics that match those of the registered face.  No
physical contact by the user with the digital device is
necessary for the unlock, but eye contact with the camera is
often essential to the proper functioning of these facial-
recognition features; thus, a user must have his or her eyes
open during the biometric scan (unless the user previously
disabled this requirement).  Several companies produce digital
devices equipped with a facial-recognition-unlock feature, and
all work in a similar manner with different degrees of
sophistication, e.g., Samsung's Galaxy S8 (released Spring
2017) and Note8 (released Fall 2017), Apple's iPhone X (released
Fall 2017).  Apple calls its facial-recognition unlock feature
"Face ID."  The scan and unlock process for Face ID is almost
instantaneous, occurring in approximately one second.

    51.  While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that
are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To
activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward

the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features.  Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

52.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

53.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the

31

device was unlocked; (2) the device has not been unlocked via
Touch ID or Face ID in eight hours and the passcode or password
has not been entered in the last six days; (3) the device has
been turned off or restarted; (4) the device has received a
remote lock command; (5) five unsuccessful attempts to unlock
the device via Touch ID or Face ID are made; or (6) the user has
activated "SOS" mode by rapidly clicking the right side button
five times or pressing and holding both the side button and
either volume button.  Biometric features from other brands
carry similar restrictions.  Thus, in the event law enforcement
personnel encounter a locked device equipped with biometric
features, the opportunity to unlock the device through a
biometric feature may exist for only a short time. I do not know
the passcodes of any devices likely to be found during the
search.

54.  In my training and experience, the person who is in
possession of a device or has the device among his or her
belongings at the time the device is found is likely a user of
the device.

55.  For these reasons, if while executing the warrant, law
enforcement personnel encounter a digital device that may be
unlocked using one of the aforementioned biometric features, the
warrant I am applying for would permit law enforcement personnel
to, with respect to any biometric sensor-enabled device that is
(a) located at the QI RESIDENCE or in the QI VEHICLE and
(b) falls within the scope of the warrant: (1) compel the use of
QI and/or LE's thumb- and/or fingerprints on the device(s); and

(2) hold the device(s) in front of the face of QI and/or LE with her/his eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

    56.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

57.   For all the reasons described above, there is probable cause to believe that: QI committed bank fraud in violation of 18 U.S.C. § 1344, misuse of a passport in violation of 18 U.S.C. § 1544, and aggravated identity theft in violation 18 U.S.C. § 1028(A); that LE committed bank fraud in violation of 18 U.S.C. § 1344 and misuse of a passport in violation of 18 U.S.C. § 1544; and that QI and LE conspired to commit the same offenses, in violation of 18 U.S.C. § 371.

58.   I further submit that there is probable cause to believe that the items listed in Attachment B are evidence, fruits, and instrumentalities of the offenses described in Attachment B, and will be found in QI RESIDENCE and the QI VEHICLE, as described in Attachments A-1 through A-2.

SA LUIS OROZCO
_____

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone

Luis Orozco
Special Agent
Diplomatic Security Service

Subscribed to and sworn before
me this 20th day of November,
2020.

*Alicia G. Rosenberg*
_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

## QI RESIDENCE TO BE SEARCHED

The property to be searched is the residence located at 1319 Parkside Drive, West Covina Ca, 91732 (the "QI Residence"). The location containing the QI residence is a condominium building containing 4 individual units. 1319 is the only two-story attached unit in the building. The condo is accessible from Parkside Drive and from the rear parking lot area. Parking spaces on the north side of the building and Parkside Drive is to the south. Each individual unit is labeled with their respective address. The QI residence is clearly marked with 1319 on the front door of the condo. The color of the building light cream exterior and it has a black roof.

The areas to be searched at the QI residence include: (a) all rooms, porches, containers, and safes in the QI residence (b) any garages, carports, storage spaces, or other outbuildings belonging to the QI residence; and (d) any digital devices found at the QI residence.

## ATTACHMENT A-2

## QI VEHICLE TO BE SEARCHED

The vehicle to be searched is a 2020 black Porsche bearing California temporary license plate BG45E32 and vehicle identification number WP0AA2A72LL102301 (the "QI Vehicle"). The QI Vehicle is registered to Zhenyi QI.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1544 (Misuse of a Passport), and 18 U.S.C. § 1028A (Aggravated Identity Theft), and conspiracy to commit the same, in violation of 18 U.S.C. § 371 (collectively, the "SUBJECT OFFENSES"), namely:

       a.   Records, documents, programs, applications, or materials relating to any bank accounts, credit card accounts, or other financial accounts;

       b.   Records, documents, programs, applications, or materials relating to identity information, including immigration, travel, or visa status, and other personal identifying information;

       c.   Records, documents, programs, applications, or materials relating to receipts or invoices for banking or financial activity not in the name of QI or LE name, but with the means of identification of another;

       d.   Records, documents, applications, or materials containing indicia of occupancy, residency or ownership of any location being searched (including surveillance video);

       e.   Equipment and software used to print banking and identification cards, to create magnetic strips for banking and identification cards, to use embossing machines to create banking and identification cards, to use laser printers to

37

create documents, and to use magnetic card readers to read and
re-encode banking and identification cards;

       f.   U.S. currency in excess of $10,000;

       g.   Gold and jewelry if worth is in excess of
$10,000;

       h.   Merchandise obtained with fraudulent identity
documents and banking information;

       i.   Records, documents, programs, applications, or
materials sufficient to show call log information, including all
telephone numbers dialed from any of the digital devices and all
telephone numbers accessed through any push-to-talk functions,
as well as all received or missed incoming calls;

       j.   Records, documents, programs, applications, or
materials sufficient to show SMS text, email communications,
social media messages and accounts, or other text or written
communications sent to or received from any of the digital
devices and which relate to the SUBJECT OFFENSES;

       k.   Documents and keys relating to public storage
units or safety deposit boxes; and

       l.   Any digital device used to facilitate the above-
listed violations (and forensic copies thereof).

       m.   With respect to any digital device used to
facilitate the above-listed violations:

          i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,

38

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## VIII.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

40

seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files
contained therein is/are encrypted.

        h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

       5.    In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

        a.    Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

        b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

        c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

        d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

        e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

        f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, if QI and/or LE is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the QI RESIDENCE, or in the QI VEHICLE and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of QI and LE onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of QI and LE with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.